[L.A. No. 31517. Sept. 13, 1982.]

CITY OF TORRANCE, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and
STATE COMPENSATION INSURANCE FUND, Respondents.

**COUNSEL**

Kegel, Tobin & Hamrick, Kegel & Tobin, David E. Lister and Stephan G. Thompson for Petitioner.

John H. Larson, County Counsel (Los Angeles), Milton J. Litvin, Daniel E. McCoy, Deputy County Counsel, Kendig, Stockwell & Gleason, Eugene L. Stockwell, Jr., Owens O'Keefe Miller, John C. Shaffer, Jr., Herrick, Lundgren, Hays, Shaffer & Lancefield, James P. Jackson, City Attorney (Sacramento), and William P. Carnazzo, Deputy City Attorney, as Amici Curiae on behalf of Petitioner.

Richard W. Younkin, William B. Donohoe, Dexter W. Young, James J. Vonk, Richard A. Krimen, Michael J. Brodie, Arthur Hershenson, Fernando Da Silva and Frank Evans for Respondents.

C. Gordon Taylor, Evans, Dalbey & Cumming, Barry F. Evans and Stafford Leland as Amici Curiae on behalf of Respondent State Compensation Insurance Fund.

## OPINION

**BIRD, C. J.**—Does the 1977 amendment to Labor Code section 5500.5, which limits the employers and compensation insurers among whom liability for cumulative injury and occupational disease claims may be apportioned, violate the contract clause of the United States and California Constitutions?

### I.

Kenneth Atkinson was employed ·as a fireman by the City of Torrance (City) from July 20, 1956, to April 30, 1977. For fifteen of the twenty-one years that Atkinson worked for the City, the State Compensation Insurance Fund (State Fund) was the workers' compensation insurer for the City. Since July 1, 1971, the City has not carried insurance.

On March 12, 1978, Atkinson died of lung cancer. Subsequently, his fifteen-year-old daughter Christine filed an application for workers' compensation death benefits against the City and the State Fund. Christine claimed that her father's death was proximately caused by a cumulative injury which developed during the course of his employment with the City.

After lengthy negotiations, the City settled the Atkinson claim for $28,165.49. Thereafter, contribution was sought from the State Fund for 72 percent (15/21sts) of the settlement amount. The City based its claim on section 5500.5 of the Labor Code.[1]

Section 5500.5 was enacted in 1951 to codify the rule announced by this court in *Colonial Ins. Co.* v. *Industrial Acc. Com.* (1946) 29 Cal.2d 79 [172 P.2d 884]. (*Flesher* v. *Workers' Comp. Appeals Bd.* (1979) 23 Cal.3d 322, 327 [152 Cal.Rptr. 459, 590 P.2d 35].) As originally enacted, the section provided that an employee claiming benefits for an

---

[1]All statutory references are to the Labor Code unless otherwise indicated.

occupational disease could recover against any one of the successive employers whose employment contributed to the disease. Also, any of the successive insurance carriers that provided coverage during such employments were liable.[2] The employer or insurer held liable had the burden of seeking the apportionment of this liability among the many other responsible employers and insurers. (Stats. 1951, ch. 1741, § 1, p. 4154; see *Flesher* v. *Workers' Comp. Appeals Bd., supra.*)

In 1973, section 5500.5 was amended to limit liability for occupational disease or cumulative injury to the five years of employment immediately preceding either the date of injury or the last date on which the employee worked in an occupation which exposed him to the hazards which caused the occupational disease or cumulative injury. (Stats. 1973, ch. 1024, § 4, p. 2032.) Apportionment of liability to earlier years was forbidden except where "the employment exposing the employee to the hazards of the claimed occupational disease or cumulative injury was for more than five years with the same employer ...." (*Id.* at p. 2034.) In such circumstances, liability could be extended to "all insurers who insure[d] the ... compensation liability of such employer, during the entire period of the employee's exposure with such employer ...." (*Ibid.*)[3] This provision, which came to be known as the "single employer exception," continued the rules which had previously been in effect for certain employers.

In 1977, the section was again revised. The 1977 amendment provided for the stepped reduction of the five-year limitation of liability to one year by 1981 and repealed the "single employer exception." (Stats. 1977, ch. 360, § 1, p. 1334.) By its terms, the amendment was applic-

[2]Although not codified in section 5500.5 until 1973, this rule was applied to cumulative injury claims as well. (See, e.g., *Fireman's Fund Indem. Co.* v. *Ind. Acc. Com.* (1952) 39 Cal.2d 831, 835 [250 P.2d 148]; *Royal Globe Ins. Co.* v. *Industrial Acc. Com.* (1965) 63 Cal.2d 60, 63 [45 Cal.Rptr. 1, 403 P.2d 129]; see also Stats. 1973, ch. 1024, § 4, p. 2032.)

[3]The full text of this exception read as follows: "If the employment exposing the employee to the hazards of the claimed occupational disease or cumulative injury was for more than five years with the same employer, or its predecessors in interest, the limitation of liability to the last five years of employment as set forth in subdivision (a) shall be inapplicable. Liability in such circumstances shall extend to all insurers who insure the workmen's compensation liability of such employer, during the entire period of the employee's exposure with such employer, or its predecessors in interest. The respective contributions of such insurers shall be in proportion to employment during their respective periods of coverage. As used in this subdivision, 'insurer' includes an employer who during any period of the employee's exposure was self-insured or legally uninsured.

"The provisions of this subdivision shall expire on July 1, 1986, unless otherwise extended by the Legislature prior to that date."

able to all cumulative injury and occupational disease claims filed on or after January 1, 1978. (*Ibid.*)[4]

In the contribution proceedings held by the Workers' Compensation Appeals Board (Board), it was undisputed that the State Fund was liable for 72 percent of the Atkinson settlement under the provisions of section 5500.5 which were in effect prior to the 1977 amendment. It was also undisputed that if the 1977 amendment were applied, the City, as a legally uninsured employer, was solely liable for the settlement.

Relying on the 1977 amendment, the State Fund moved for dismissal of the case. The City opposed this motion and argued that the 1977 amendment violated the state and federal prohibitions against impairment of contracts since it abrogated the State Fund's alleged preexisting contractual obligation to contribute to the settlement. (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.) The Board granted State Fund's motion and denied the City's subsequent petition for reconsideration. The City now seeks review of the Board's decision.

## II.

■ This court must decide whether the 1977 repeal of the "single-employer exception" to section 5500.5 violates the contract clauses of the United States and California Constitutions.

The language of these clauses "appears unambiguously absolute . . . ." (*Allied Structural Steel Co.* v. *Spannaus* (1978) 438 U.S. 234,

[4]As amended by Statutes 1977, chapter 360, section 1, page 1334, Labor Code section 5500.5, subdivision (a) provides: "(a) Except as otherwise provided in Section 5500.6 [which applies to household employees], liability for occupational disease or cumulative injury claims filed or asserted on or after January 1, 1978, shall be limited to those employers who employed the employee during a period of four years immediately preceding either the date of injury, as determined pursuant to section 5412, or the last date on which the employee was employed in an occupation exposing him to the hazards of such occupational disease or cumulative injury, whichever occurs first. Commencing January 1, 1979, and thereafter on the first day of January for each of the next two years, the liability period for occupational disease or cumulative injury shall be decreased by one year so that liability is limited in the following manner:

"For claims filed or asserted on or after:                                                        The period shall be:

January 1, 1979 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . three years
January 1, 1980 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . two years
January 1, 1981 and thereafter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . one year

"If, based upon all the evidence presented, the appeals board or referee finds the existence of cumulative injury or occupational disease, liability for such cumulative injury or occupational disease shall not be apportioned to prior or subsequent years . . . ."

240 [57 L.Ed.2d 727, 733, 98 S.Ct. 2716].) "No State shall ... pass any ... law impairing the obligation of contracts...." (U.S. Const., art. I, § 10.) "A ... law impairing the obligation of contracts may not be passed." (Cal. Const., art. I, § 9.) Read literally, these provisions appear to proscribe any impairment. ■ However, it has long been settled that the proscription is "not an absolute one and is not to be read with literal exactness like a mathematical formula." (*Home Bldg. & L. Assn.* v. *Blaisdell* (1934) 290 U.S. 398, 428 [78 L.Ed. 413, 423, 54 S.Ct. 231, 88 A.L.R. 1481].)

As the United States Supreme Court recently stated, "it is to be accepted as a commonplace that the Contract Clause does not operate to obliterate the police power of the States. 'It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected....' [Citation.] As Mr. Justice Holmes succinctly [stated] ... 'One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject matter.'" (*Allied Structural Steel, supra*, 438 U.S. at pp. 241-242 [57 L.Ed.2d at p. 734].)

Thus, a finding that the state in the exercise of its police power has abridged an existing contractual relationship does not in and of itself establish a violation of the contract clause. It is the beginning, not the end of the analysis. A finding of impairment merely moves the inquiry to the next and more difficult question—whether that impairment exceeds constitutional bounds. Obviously, if the contract clause is to have any substance, it must place some limits upon the state's exercise of the police power. (*Allied Structural Steel, supra*, 438 U.S. at p. 242 [57 L.Ed.2d at pp. 734-735].)

In applying these principles to the present case, this court's first inquiry must be whether the repeal of the "single employer exception" impaired the obligations of the City's insurance contracts with State Fund. ■ "The obligations of a contract are impaired by a law which renders them invalid, or releases or extinguishes them ...." (*Home Bldg. & L. Assn.* v. *Blaisdell, supra*, 290 U.S. at p. 431 [78 L.Ed. at p. 425], citing *Sturges* v. *Crowninshield* (1819) 17 U.S. (4 Wheat.) 122, 197-198 [4 L.Ed. 529, 549].)

The City contends that it paid the State Fund valuable consideration in the form of insurance premiums. In return, the State Fund allegedly promised to pay benefits for that portion of any cumulative injury attributable to the period during which coverage was provided to the City. It is undisputed that the repeal of the "single employer exception" to section 5500.5 operated to release to a substantial degree the State Fund from this obligation. As a result of the repeal, the State Fund was no longer obligated in every case to pay for that portion of a cumulative injury which was incurred during the time its policies were in effect.[5] Therefore, if the City's characterization of the obligation assumed by the State Fund pursuant to its insurance contracts is correct, the repeal must be found to have impaired the obligations of the City's contracts.

On closer examination, it is apparent that the City's characterization of the State Fund's obligation is not accurate. Pursuant to its insurance contracts with the City, the State Fund agreed "to pay promptly and directly to any person entitled thereto under the Work[ers'] Compensation Laws . . ., and as therein provided, any sums due for compensation . . .; to be directly and primarily liable . . . to pay the compensation, if any, for which the [City] is liable . . .; and [to] be bound by and subject to the orders, findings, decisions or awards rendered against the [City] under the Work[ers'] Compensation Laws . . . ." (See Ins. Code, §§ 11651, 11654.)

Clearly, the *only* obligation the State Fund assumed was the obligation to pay what the workers' compensation law required. Did this promise encompass the text of that law as it existed when the insurance contracts were made, or did the parties recognize and intend that subsequent changes in the law be applied?

Ordinarily, "'all applicable laws in existence when an agreement is made, which laws the parties are presumed to know and to have had in mind, necessarily enter into the contract and form a part of it, without any stipulation to that effect, as if they were expressly referred to and incorporated.' [Citation.]" (*Alpha Beta Food Markets* v. *Retail Clerks Union* (1955) 45 Cal.2d 764, 771 [291 P.2d 433]; accord *Swenson* v. *File* (1970) 3 Cal.3d 389, 393 [90 Cal.Rptr. 580, 475 P.2d 852]; see also *Home Bldg. & L. Assn.* v. *Blaisdell, supra,* 290 U.S. at

---

[5]For example, if a worker's last injurious exposure were found to have taken place during the period that State Fund insured the City, State Fund would remain obligated to pay all or part of any compensation award under the 1977 amendment to section 5500.5. (See *ante,* fn. 4.)

pp. 429-430 [78 L.Ed. at pp. 423-424].) "[L]aws enacted subsequent to the execution of an agreement," however, "are not ordinarily deemed to become part of the agreement *unless its language clearly indicates this to have been the intention of the parties.* [Citations.]" (*Swenson* v. *File, supra*, at p. 393, italics added.)

In *Swenson* v. *File, supra*, 3 Cal.3d 389, this court spoke to this issue. The case involved a covenant in a partnership agreement which was made in 1960. The covenant provided that a retired partner would not "'render service to a client which has its principal office within a radius of twenty miles from any partnership office which existed on the date of his retirement.'" (*Id.*, at p. 392.) When the agreement was made, this provision was invalid under section 16602 of the Business and Professions Code to the extent that it restricted a former partner from competing for clients located in areas beyond the boundaries of the cities or towns where the partnership had its offices. (*Ibid.*) A year later, that statute was revised to permit countywide restrictions. Shortly thereafter, the defendant withdrew from the partnership and went into business in the same county. (*Id.*, at pp. 391-392.) The *Swenson* court held that the covenant could not be interpreted as incorporating the revised statute. "[T]o hold that subsequent changes in the law which impose greater burdens or responsibilities upon the parties become part of that agreement would result in modifying it without their consent, and would promote uncertainty in commercial transactions. [Citation.] We recognize that the parties could have originally agreed to incorporate subsequent changes in the law ..., but there is no evidence that they did so in this case." (*Id.*, at pp. 394-395.)

██ Here, however, there is such evidence. First, the language of the agreements between the City and the State Fund clearly indicates that it was the intention of all the parties to incorporate subsequent changes in the law. "[W]hen an instrument provides that it shall be enforced according either to the law generally or to the terms of a particular ... statute, the provision must be interpreted as meaning the law or the statute in the form in which it exists at the time of such enforcement." (14 Cal.Jur.3d, Contracts, § 173, p. 433, citing *United Bank & Trust Co.* v. *Brown* (1928) 203 Cal. 359, 362-363 [264 P. 482].) Moreover, at oral argument in this case, the City agreed that it was the parties' intention to incorporate subsequent changes in the law in their insurance agreements.

Since the City originally agreed to incorporate subsequent changes in the law of workers' compensation in its insurance agreements with the

State Fund, it cannot complain that those changes impaired the State Fund's obligations. The City had every reason to anticipate that its rights under those agreements would change over time. It had no other legitimate contractual expectation. (Compare *Allied Structural Steel, supra*, 438 U.S. at pp. 245-246 [57 L.Ed.2d at p. 737]; see also *Veix* v. *Sixth Ward Assn.* (1940) 310 U.S. 32, 38 [84 L.Ed. 1061, 1065, 60 S.Ct. 792].)

The decision of the Workers' Compensation Appeals Board is affirmed.

Richardson, J., Newman, J., Kaus, J., Broussard, J., and Reynoso, J., concurred.

**MOSK, J.**—I dissent.

The issue in this case is whether an amendment to section 5500.5 of the Labor Code in 1977[1] results in the impairment of a workers' compensation insurance contract, in violation of the United States and California Constitutions.[2]

The workers' compensation law requires an employer to pay benefits to an employee injured as the result of continuous trauma or occupational disease incurred in the employment. Prior to the amendment of section 5500.5 in 1977, the liability for such benefits was divided among various employers (with certain limitations) in proportion to the period of time the employee was exposed to the risk in each employment. The workers' compensation insurer was liable for these pro rata benefits.

Subdivision (d) of the section provided before 1977 that if the employment was for a period longer than five years, each successive insurer of the employer during the period of cumulative injury was liable for the payment of benefits for the period during which the policy was in force. In 1977 subdivision (d) was repealed, with the result that an employer whose employee had suffered cumulative injury while a policy was in effect but who later became self-insured was required to pay compensation attributable to a period during which it had paid premiums for a policy to cover the risk of such injury.

---

[1] All references are to the Labor Code, unless otherwise noted.

[2] Article I, section 10, of the United States Constitution provides, "No State shall ... pass any ... law impairing the obligation of contracts ...."

Article I, section 9, of the California Constitution similarly mandates that "A ... law impairing the obligation of contracts may not be passed."

Kenneth Atkinson died on March 12, 1978, from lung cancer. His only surviving dependent, his 15-year-old daughter Christine, filed an application for workers' compensation death benefits against the City of Torrance (City) and the State Compensation Insurance Fund (State Fund). She alleged that his death resulted from cumulative trauma and exposure to carcinogens during his employment by City as a fireman from July 20, 1956, through April 30, 1977. State Fund had insured City for workers' compensation liability from a time prior to 1956 through June 30, 1971. Since that date City has been self-insured. If section 5500.5, subdivision (d), had not been repealed in 1977, State Fund would have been liable for the payment of benefits for 15 of the 21 years of Atkinson's employment.

City settled the Atkinson claim for $28,165.49, reserving the right to seek contribution from State Fund, which agreed to pay 72 percent of the settlement if the 1977 amendment to section 5500.5 were held to be unconstitutional. I believe that it is unconstitutional as applied in this case.

The legislative revision of section 5500.5 in 1977 was no mere minor alteration. It accelerated reduction (through 1981) of the five-year period of employer (and insurer) liability to one year, and eliminated the "single employer exception" by repealing subdivision (d). According to the report of a legislative committee which considered the proposed amendment, the purpose of reducing the period of exposure for individual risks to one year was to permit "loss experiences to be more closely reflected in current dollars." The report went on to point out that a major consequence of the bill would be a dramatic shift of liability for cumulative injuries: "To the extent that the shift is from one insurer to another, and assuming that each has a fairly representative spectrum of risks, the net fiscal impact of enactment of [the bill] would appear relatively insignificant. To the extent that an insurer is absolved of liability in one case, he may be presented with a larger liability on another. The net effect may be a 'wash.'"

On the other hand, "if an employer has recently become self-insured, he may be held fully liable for the payment of benefits for cumulative injury without being able to turn to a prior insurer for contribution in cases where the single employer exception applies. Opponents argue that since they paid their premium on an 'occurrence' basis and are entitled to contribution under existing law, it would be unfair for the

Legislature to absolve those workers' compensation insurers of liability and shift that loss to the self-insured employer."

As to the financial amounts involved in this shift, the report stated: "The exact amount . . . is not known but it has been estimated by the insurance industry to be approximately $52.7 million for the period of 1978 through 1981. Of this amount, it is estimated that $15.3 million will be shifted to private self-insurers and $37.4 million shifted to public agencies." The analysis concluded that "the greatest fiscal impact appears to be on those public agencies who were formerly covered by the State [Fund]." (Assem. Com. on Finance, Insurance and Commerce, Interim Hgs. on Assem. Bill No. 155 (Apr. 27, 1977) p. 4.) That, of course, is the predicament of the City of Torrance.

The first step in determining the merit of City's assertion that the deletion of the "single employer exception" results in an unconstitutional impairment of its contract with State Fund is to decide whether the policy covered the injury sustained by Atkinson. The policy, in accordance with provisions of law, required State Fund to be "liable to employees . . . or in the event of death, to their dependents, .to pay the compensation . . . for which the insured is liable."[3] Since City was liable for "cumulative trauma" suffered by its employees, it follows that State Fund also incurred such liability.

State Fund contends, however, that the repeal of the "single employer exception" in 1977 did not affect its obligation to provide benefits for injuries which occurred during the time its policy was in force. That is, it argues, since a cumulative injury occurs when the employee first suffers disability and knows that the disability is caused by his employment (§§ 3208.1, 5412), Atkinson was not injured while State Fund insured City, but thereafter, while City was self-insured. Thus, the 1977 amendment only deprived City of its right to seek contribution for the portion of the injury sustained by Atkinson during the time the State Fund policy was in effect.

But the rule that liability for cumulative injuries must be apportioned among successive employers and their insurers has long prevailed in this state (e.g., *Royal Globe Ins. Co. v. Industrial Acc. Com.* (1965) 63 Cal.2d 60, 64 [45 Cal.Rptr. 1, 403 P.2d 129]), and the parties are pre-

---

[3]Section 11651 of the Insurance Code provides that every contract of workers' compensation insurance shall provide that the insurer will be liable for payment of compensation for which the employer is liable, subject to the provisions of the policy.

sumed to have recognized its existence at the time they entered into the insurance contract. Thus, the premiums paid by City to State Fund during the period the policy was in effect were based on the assumption that State Fund would be liable for any portion of a cumulative injury incurred by City's employees during the period of policy coverage even though the employee's disability may not have occurred until a later time. It is clear, therefore, that the parties had bound themselves to a contract which, at the time it was made, and until the amendment of section 5500.5 in 1977, obligated State Fund to reimburse City for its apportioned share of cumulative trauma claims.

State Fund argues that a workers' compensation contract is subject to policy considerations and that the Legislature may, by statute, affect the rights of the parties under such a contract. In support of this assertion, it cites cases from California and other jurisdictions, and points to the fact that the policy of insurance provided that it was to be governed by the workers' compensation laws. The majority opinion leans heavily on that proposition.

But the cases relied upon for this proposition are inapposite. In *Argonaut Mining Co.* v. *Ind. Acc. Com.* (1951) 104 Cal.App.2d 27 [230 P.2d 637], between the time the decedent had incurred a cumulative injury and the date of his death in 1948, the Legislature had increased the benefits payable to an employee. The employer claimed that the award of compensation on the basis of rates in effect in 1948 impaired the obligation of its contract with the deceased employee because at the time of hire the parties "dealt in contemplation" of the statutes in existence when the injury was incurred and those statutes had become an integral part of the employment contract. It was held that the right to workers' compensation was not founded upon contract, but upon statutory rights and duties arising from the employer-employee relationship, and that such rights are imposed by the law as incidents of that status. (See also *McAllister* v. *Bd. of Education* (1963) 79 N.J. Super. 249 [191 A.2d 212, 218]; *Schmidt* v. *Wolf Contracting Co.* (1945) 269 App.Div. 201 [55 N.Y.S.2d 162, 167-168].)

In the present case, however, the issue is not the liability of an employer for compensation to his employee, but whether the state may by statute relieve an insurer of its obligation to indemnify the employer for a risk which the insurer had agreed to bear and for which the employer

had paid premiums.[4] Obviously, the relationship of an employer to its workers' compensation carrier is fundamentally contractual in nature. Efforts by the Legislature to affect that relationship are subject to constitutional limitations.

Since the 1977 legislation relieved State Fund of obligations it would have had prior to the amendment, the elimination of the "single employer exception" amounted to an impairment of contract. Admittedly not every contractual impairment violates the constitutional mandate; under some circumstances impairment has been held to be justified.

The seminal case in contract clause analysis is *Home Building and Loan Assn.* v. *Blaisdell* (1934) 290 U.S. 398 [78 L.Ed. 413, 54 S.Ct. 231, 88 A.L.R. 1481], in which the United States Supreme Court upheld a state act that placed a moratorium on foreclosures during the Great Depression. To justify the impairment of contractual obligations in that case, the court found four factors to be significant: (1) an emergency existed, as declared by the Legislature; (2) the legislation was addressed to a legitimate end—the protection of basic interests of society —and was not enacted for the advantage of particular individuals; (3) the legislative changes were appropriate to the emergency and were based on reasonable conditions; and (4) the legislation was temporary in operation and limited to the emergency. (*Id.* at pp. 444-447 [78 L.Ed. at pp. 432-433].)

In later cases, the high court has discussed additional factors to be considered in determining whether an impairment violates the Constitution. Governmental acts are subject to a stricter level of scrutiny when a "substantial impairment" is found. In such a situation, a "careful examination of the nature and purpose of the state legislation" must be conducted, keeping in mind that "[t]he severity of the impairment measures the height of the hurdle the state legislation must clear." (*Allied Structural Steel Co.* v. *Spannaus* (1978) 438 U.S. 234, 244-245 [57 L.Ed.2d 727,.736-737].)

Another circumstance which calls for stringent review is if the legislation modifies the government's own financial obligations. The deference traditionally given to a legislative assessment of reasonableness

[4]Nor does *State of California* v. *Industrial Accident Commission* (1959) 175 Cal. App.2d 674 [346 P.2d 861], support State Fund's position. There, the Legislature repealed a statute giving insurers a right of contribution from the Subsequent Injuries Fund under some circumstances—a right which was purely statutory rather than contractual in nature.

and necessity is not appropriate in that circumstance "because the State's self-interest is at stake." (*United States Trust Co.* v. *New Jersey* (1977) 431 U.S. 1, 26 [52 L.Ed.2d 92, 112, 97 S.Ct. 1505]; *Sonoma County Organization of Public Employees* v. *County of Sonoma* (1979) 23 Cal.3d 296, 310 [152 Cal.Rptr. 903, 591 P.2d 1] [hereinafter *Sonoma County*]; see *Fletcher* v. *Peck* (1810) 10 U.S. (6 Cranch) 87 [3 L.Ed. 162].)

In applying these standards to the contract in question, we must first decide whether the state was attempting to modify its own obligations. While the state itself is not a party to this proceeding, the State Fund, an autonomous state agency, is involved. Organized and established by the Legislature in 1914, pursuant to the provisions of article XX, section 21, of the California Constitution, the State Fund has been regulated and supervised directly since that time by the state Insurance Commissioner. (See *Gilmore* v. *State Comp. Ins. Fund* (1937) 23 Cal.App. 2d 325, 329 [73 P.2d 640].) Sections 11770 through 11881 of the Insurance Code provide extensive rules regulating the organization, powers, rates, policies, reports and other rights and duties of the State Fund. The board of directors of the State Fund is appointed by the Governor (*id.*, § 11770), and its employees are civil servants. Furthermore, the State Fund is authorized to receive specific appropriations from the Legislature. (*Id.*, § 11773.) This relationship between the state and State Fund makes the state a direct beneficiary of the 1977 legislative changes, and heightens the level of scrutiny that we must apply.

The case for stricter scrutiny is buttressed if the contractual impairment is determined to be severe. In *Allied Structural Steel* the high court invalidated Minnesota's Private Pension Benefits Protection Act when it found its effect on contractual obligations severe. There a basic term of the pension contract was retroactively modified. The court stressed the element of reliance as a key ingredient in measuring severity, particularly in the context of pension and insurance funds. "'These plans, like other forms of insurance, depend on the accumulation of large sums to cover contingencies. The amounts set aside are determined by a painstaking assessment of the insurer's likely liability. Risks that the insurer foresees will be included in the calculation of liability, and the rates or contributions charged will reflect that calculation. The occurrence of major unforeseen contingencies, however, jeopardizes the insurer's solvency and, ultimately, the insureds' benefits. *Drastic changes in the legal rules governing pension and insurance funds, like other unforeseen events, can have this effect.'*" (Italics added.) (*Allied*

*Structural Steel Co.* v. *Spannaus, supra,* 438 U.S. at pp. 246-247 [57 L.Ed.2d at p. 738], quoting from *Los Angeles Dept. of Water & Power* v. *Manhart* (1978) 435 U.S. 702, 721 [55 L.Ed.2d 657, 673, 98 S.Ct. 1370].)

As was the case in *Allied Structural Steel,* the statutory changes which removed the single employer exception in 1977 "nullifie[d] express terms" of the State Fund's contractual obligations with the City and "impose[d] a completely unexpected liability in potentially disabling amounts." (*Id.,* at p. 247 [57 L.Ed.2d at p. 738].) When the City became self-insured in 1971, it reasonably and justifiably relied on State Fund's honoring its contractual commitments, including the incurred but not reported loss reserve to cover anticipated cumulative trauma claims. The law in effect at that time mandated that State Fund be responsible for such future claims, and that law was part of the contract by which to measure the obligations of the parties. This has been made clear in every California case on the subject. (See, e.g., *Interinsurance Exchange* v. *Ohio Cas. Ins. Co.* (1962) 58 Cal.2d 142 [23 Cal.Rptr. 592, 373 P.2d 640]; *Alpha Beta Food Markets* v. *Retail Clerks* (1955) 45 Cal.2d 764, 771 [291 P.2d 433] (cert. den. 350 U.S. 996 [100 L.Ed. 861, 76 S.Ct. 547]); *Bell* v. *Minor* (1948) 88 Cal.App. 2d 879, 881 [199 P.2d 718].) Thus, the 1977 changes attempted to shift unforeseen and formidable liabilities to the City, the severity of which in terms of millions of dollars cannot be doubted.

Accordingly, in applying the *Blaisdell* factors to this case we should observe stricter scrutiny because *the contractual impairment is severe and the state is attempting to modify its own obligations.*

The first part of the *Blaisdell* test—a legislative declaration of emergency—is a "threshold" hurdle that the state must overcome. (*Sonoma County, supra,* 23 Cal.3d at p. 312.) In *Sonoma County* the Legislature had specifically included a declaration of fiscal emergency, but we found insufficient factual evidence to support such a conclusion. In the case before us, there is nothing in the record to indicate that an emergency justified the repeal. Analysis of the other *Blaisdell* criteria adds no more support to State Fund's position.

The remaining factors of the analysis require a showing that the legislation was enacted to protect basic interests of society, were based on reasonable conditions, and were temporary in duration. The legislative acts here, as those in *Allied Structural Steel,* were not enacted to deal

with a broad, generalized economic or social problem. (See *Allied Structural Steel, supra*, 438 U.S. at p. 245 [57 L.Ed.2d at pp. 736-737].) Moreover, the cost shift effected by the legislation was total and irrevocable rather than merely temporary in nature.

State Fund and amicus curiae urge that the 1977 revisions were necessary to "streamline procedures" and "reduce litigation costs and delay." As to the effect on litigation, however, there is no showing that the "single employer exception" had any negative impact on an applicant's ability to obtain benefits in a just and expeditious fashion. And the need to "streamline procedures" is obviously insufficient to justify the severe impairment which occurred here. The streamlining for State Fund is at the expense of a substantial burden upon the City.

The board and State Fund claim that the 1977 legislation was justified as an exercise of the police power; they suggest that when the state acts under this plenary power, contractual obligations can be impaired at will. It is of course true that the contract clause does not obliterate the police power of the state. (*Allied Structural Steel, supra*, 438 U.S. at p. 241 [57 L.Ed.2d at p. 734].) We have pointed out that "The state's police power remains paramount, for a legislative body 'cannot "bargain away the public health or the public morals."'" (*Sonoma County, supra*, 23 Cal.3d at p. 305, quoting from *Blaisdell, supra*, 290 U.S. at p. 436 [78 L.Ed. at p. 428].) However, it is equally true that "if the contract clause is to have any effect, it must limit the exercise of the police power to some degree." (*Sonoma County, supra*, 23 Cal.3d at p. 305.) In my view the Legislature exceeded the limits of its power here.

I would hold that section 5500.5 is unconstitutional insofar as it relieves State Fund of its obligation to pay death benefits attributable to Atkinson's employment during the time it provided workers' compensation insurance to City. I would annul the board's decision.

Petitioner's application for a rehearing was denied October 13, 1982.